[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT. 27, 2001
THOMAS K. KAHN
CLERK

_____

Nos. 00-10201 & 00-13319

_____

D.C. Docket No. 92-00230 CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRED DE LA MATA,
ENRIQUE FERNANDEZ, a.k.a. Henry,
MANUEL A CALAS,
OSCAR CASTILLA,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 27, 2001)**

Before ANDERSON, Chief Judge, RONEY and FAY, Circuit Judges.

FAY, Circuit Judge:

Fred De La Mata, Manuel A. Calas, Oscar Castilla and Enrique Fernandez ("appellants") appeal their criminal convictions and sentences for bank fraud in violation of 18 U.S.C. § 1344, conspiracy to defraud the United States in violation of 18 U.S.C. § 371, misapplication of bank funds, in violation of 18 U.S.C. § 656, making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014, money laundering, in violation of 18 U.S.C. § 1956, making or causing to be made false entries, in violation of 18 U.S.C. § 1005, and engaging and conspiring to engage in a pattern of racketeering activities in violation of 18 U.S.C. §§ 1962(c) and(d).  Appellants contend that the ex post facto clause barred their prosecution, that the indictment and jury instructions were fatally defective, that there was insufficient evidence to support their convictions and that the discovery of new evidence mandated the grant of a new trial.  We find that appellants' convictions on two counts of bank fraud violated the ex post facto clause, but affirm their convictions and sentences in all other respects.

I.      Background

The charges arose out of several transactions involving the Republic National Bank ("RNB" or "the Bank"), a nationally chartered financial institution

headquartered in Dade County, Florida. We summarize the facts, viewed in the light most favorable to the jury's verdict.

De La Mata, Calas, and Castilla (hereinafter the "bank insiders") were employed by RNB prior to 1983 until they resigned in the fall of 1988. De La Mata served as RNB's Deputy President until 1985, thereafter as President and Chief Operating Officer, and at all times a member of the Board of Directors. Calas served as the RNB's Senior Vice President until July 1988, and thereafter as Executive Vice President. Castilla was Senior Vice President during the entire period. In addition, De La Mata, Calas and Castilla were all members of RNB's Loan Committee. Fernandez was a local real estate speculator, ostensibly unconnected with RNB.

A.     The Bank Branch Transactions

1.     The Westlands branch

In May 1983, Calas retained attorney Anthony Silva to act as "trustee" in the purchase of certain real property located in Hialeah, Florida (hereinafter the "Westlands"). Calas, through Silva, obtained a contract to purchase the tract for $325,000, and provided Silva with the money for the initial deposit. Calas also directed Silva to form a corporation called Hialeah Properties, Inc., for the purpose of acquiring the Westlands property. The corporation's shares were initially issued

in the name of Daniel Blanco, but that stock issuance was later voided and the shares were divided among De La Mata (50%), Calas (25%), and Castilla (25%). Calas approached Daniel Blanco to head the corporation, which Blanco understood to be a "ceremonial" position since he would not have a financial or operational stake in the corporation. The purpose of his job, according to Blanco, was to act as owner of the property in order to conceal Calas' involvement from RNB.

After procuring the purchase contract, Calas proposed to Luis Botifoll, Chairman of the Board of RNB, that RNB acquire the Westlands site for use as a branch banking facility. Calas did not disclose the bank insiders' financial interest in the property. Silva testified that he also discussed the proposal with Botifoll, fully aware that he was not to reveal the identities of the true parties in interest. Thereafter, Calas arranged for Botifoll to meet Blanco, the purported owner of the Westlands site, whereupon the two, on behalf of RNB and the "trust," negotiated a 30 year lease with an option to purchase the site. The rent commenced at $6500 per month, and escalated each year according to the cost of living. A government expert witness testified at trial that RNB had paid $362,000 above the fair market rental value as of the date of indictment.

On July 21, 1982, RNB's Board of Directors approved the lease Botifoll had negotiated. De La Mata participated in the vote, and concealed the bank insiders'

4

personal interest in the transaction. In this way, De La Mata also caused RNB to fail to disclose, in the bank's application to the Office of the Comptroller of the Currency ("OCC") to open a branch facility, the involvement of bank officers in the transaction.

2.      The Little Havana branch

In September 1983, Fernandez obtained a purchase contract for $700,000 for a site in Little Havana consisting of a bank building (two ground leases) and its adjoining parking lot (fee simple lot). Fernandez obtained the purchase contract in the name of the Fernandez Land Trust, an entity initially created for the benefit of Fernandez but later secretly amended to include the bank insiders as named beneficiaries accordingly: De La Mata 37-1/2%, Calas 18-3/4%, Castilla 18-3/4% and Fernandez 25%. Calas provided a substantial portion of the $70,000 that Fernandez tendered as a down payment.

Thereafter, De La Mata proposed that RNB acquire the Little Havana site for use as a branch facility, and introduced Fernandez to Botifoll as the property's owner. At an October 1983 meeting of the RNB Directors, De La Mata participated in discussions to acquire the Little Havana branch building, and initiated the motion to apply to the OCC for a license to open the branch. Ultimately, RNB agreed to lease the Little Havana site for three years at an annual

rate of $156,000, and to pay $100,000 per year to maintain an option to purchase the building.

In December 1983, the RNB Loan Committee approved a $700,000 loan to the Fernandez Land Trust, thus, completely underwriting the purchase of the Little Havana property. De La Mata, Calas and Castilla all voted to approve the loan to the Fernandez Land Trust while concealing their interest therein. In effect, the bank insiders caused RNB to misrepresent to the OCC in its branch opening application that no bank employees were involved in the transaction.

In August 1984, RNB needed additional parking for the Little Havana site. De La Mata proposed that RNB acquire, for an additional $150,000, the adjacent parking lot, the purchase of which RNB had unknowingly financed through the $700,000 loan to the Fernandez Land Trust. At the RNB Board meeting on August 22, 1984, De La Mata concealed his interest in the subject property and voted to approve the acquisition.

At the conclusion of the three year lease, on December 24, 1986, RNB purchased the Little Havana site from the Fernandez Land Trust for $1,000,000, including the option payments. The uncontested appraised value of the property, including the parking lot, was $291,000, resulting in approximately $850,000 loss to RNB.

6

### 3. The International Private Banking branch

In March 1984, Calas, Castilla and Fernandez retained attorney William Shockett to represent them in the purchase of property on LeJeune Road, near Miami International Airport. Shockett, as "trustee," entered into a contract to purchase the site for $700,000. Calas and Castilla provided the $70,000 down payment. At some point, De La Mata proposed to bank officials that RNB acquire the property for use as its International Private Banking ("IPB") branch, and arranged for a meeting between Botifoll and Fernandez, who purported to be the site's owner. Although Shockett advised his clients on the necessity of disclosure, Fernandez concealed the identities of his co-venturers from Botifoll.

Appellants, through a Florida corporation entitled "Real Estate Partners," applied to RNB for a loan to finance the purchase of the IPB site. When Shockett learned that RNB might not only lease, but also finance and lease back the property from its own officers, Shockett again warned of the conflict of interest and again was reassured that the Bank knew everything. Yet, the financial statement submitted in support of Real Estate Partners' loan application to RNB blatantly misrepresented Fernandez to be the sole shareholder of the corporation. It is undisputed that the shares of Real Estate Partners were divided among De La Mata (37-1/2%), Calas (18-3/4%), Castilla (18-3/4%) and Fernandez (25%).

7

On June 27, 1984, the RNB Board voted to pursue this site as a branch location. De La Mata participated in the discussion and cast an affirmative vote without disclosing his, or Calas' and Castilla's ownership interest in the property. After some negotiation, RNB entered into an agreement dated August 3, 1984, to lease the IPB site from Real Estate Partners for $165,000 per year with an option to purchase the property and premises after eight years. The evidence at trial showed that RNB paid $510,000 in excess of the fair market rental value during the first seven years of the lease.

On August 9, 1984, RNB's Loan Committee approved two loans, one to Real Estate Partners in the amount of $560,000 and one to Fernandez in the amount of $190,000, the proceeds of which were used to acquire the IPB property. De La Mata, Calas and Castilla all voted to approve the requested loans, without disclosing that they were the recipients. As a result of the bank insiders' deception, RNB filed an OCC bank branch application which failed to disclose the interest of its own officers in the site's acquisition.

On or about April 1, 1985, Real Estate Partners applied to RNB for another loan, in the amount of $180,000, for the construction of additional floor space at the IPB branch site. Calas prepared the paperwork for the loan, and the loan was issued without presentation to, or approval by, the Loan Committee.

Around May of 1987, Real Estate Partners pledged the IPB site and rents due under the pending lease with RNB to Ocean Bank as collateral for a loan in the amount of $1,000,000. Real Estate Partners satisfied its $700,000 debt obligation to RNB, and distributed the remaining proceeds to the appellants.

4.    The Orange Bowl branch

In March 1985, Fernandez again retained Shockett to draft a contract, this time for the acquisition of property located near the Orange Bowl in Miami (hereinafter "Orange Bowl" site). Shockett obtained a contract to purchase the property for $300,000 in the name of "Fernandez as trustee." On June 19, 1985, prior to closing, Fernandez assigned the purchase contract to Real Estate Partners.

Acting through Fernandez, Real Estate Partners applied to RNB for financing, again misrepresenting Fernandez as the sole corporate shareholder. In addition, the loan application introduced as evidence at trial revealed that Real Estate Partners received a pre-approved loan on De La Mata's authorization. The loan, in the amount of $250,000, was disbursed to Real Estate Partners on June 19, 1985. The Loan Committee subsequently ratified the loan on June 27, 1985, with De La Mata, Calas and Castilla all voting in favor thereof.

At a meeting of the RNB Executive Committee[1] on September 24, 1985, De La Mata proposed that RNB acquire the Orange Bowl site for use as a branch facility. De La Mata revealed that he had already negotiated tentative terms with Fernandez, the purported owner of the property, for the construction of a bank building and a five year lease with option to purchase the property and premises. De La Mata did not disclose to the other directors that the bank insiders owned the Orange Bowl property. Thereafter, Calas took charge of overseeing construction costs and negotiating lease terms.

In the spring of 1986, Real Estate Partners applied to RNB for two loans, the proceeds of which would be used for the construction of the Orange Bowl bank building. In support of this application, Real Estate Partners again submitted a financial statement falsely stating that Fernandez owned 100% of the corporation's stock. The Loan Committee approved the loans at its meeting of June 19, 1986. De La Mata, Calas and Castilla each voted to extend credit without disclosing their personal financial interest in Real Estate Partners.

---

[1] Established by the Board of Directors, the Executive Committee was composed of Board members and was authorized to make operational and management decisions arising between monthly Board meetings. The Executive Committee was composed, at this time, of Mr. Isaias, RNB's majority shareholder, Dr. Botifoll, Mr. Sastre, Mr. Gonzalez-Blanco, and Mr. De La Mata.

RNB ultimately decided to purchase rather than lease the Orange Bowl property.[2] Fernandez offered the site and its newly constructed building for $1.15 million, but following negotiations, RNB agreed to purchase the site for $960,000. Given that Real Estate Partners had spent $300,000 to purchase the land, and $277,000 to construct the building (based on cancelled checks from Real Estate Partners' bank account with RNB), plus some incidental costs, appellants realized approximately $380,000 profit on the deal in one year. The Executive Committee approved the purchase price on June 23, 1986, at which time De La Mata cast an affirmative vote while concealing the insiders' conflict of interest.

B.    Foreclosed Real Estate ("OREO" properties)[3]

In early 1986, RNB foreclosed on some property that collateralized a defaulted loan. The evidence showed that Calas had been the loan officer on the account, and approximately $200,000 was due on the balance. Appellants created "Great Group Investments" (hereinafter "Great Group"), a Florida corporation, and distributed the shares to De La Mata's family (37-1/2%), Calas (18-3/4%), Castilla

---

[2] The evidence showed that the Bank's decision to buy rather than lease the Orange Bowl site was in large part based on the desire to complete and cease further business with Fernandez. Mr. Isaias testified that it had become a hassle to continually obtain Board approval for the rising costs of construction claimed by Fernandez.

[3] OREO stands for "other real estate property" signifying property that the Bank had acquired trying to collect loans as distinguished from property used in the Bank's operations.

(18-3/4%) and Fernandez (25%). Acting as the corporation's owner, Fernandez made an offer to purchase the OREO properties from RNB for $130,000. It had been appraised at $207,000. On February 14, 1986, the committee responsible for reviewing all defaulted loans and approving sales of OREO properties approved the sale to Great Group. De La Mata, a member of this committee, voted in favor of the transaction without disclosing his personal interest in Great Group.

When Great Group applied to RNB for a $100,000 loan to finance the purchase, it submitted a financial statement falsely representing Fernandez as the sole shareholder of Great Group. The RNB Loan Committee considered and approved the loan on June 5, 1986. In customary fashion, De La Mata affirmatively voted in favor of the application while concealing the ownership interest of the bank insiders in Great Group. Over the course of the following year, Great Group sold the OREO properties for $340,000, thereby realizing a profit of $210,000. RNB lost $81,000 on the properties.

In October 1986, Calas and Castilla informed attorney Shockett that RNB held two defaulted notes secured by real property whose appraised value greatly exceeded the remaining balances due on the loans. At the direction of Calas and Castilla, Shockett formed a corporation named "CSEC," and divided the ownership between Castilla's niece, Myra Espinola and her husband (together 75%) and

12

Shockett (25%). Castilla helped Shockett purchase the defaulted notes by arranging for an unsecured loan in the amount of $100,000 through RNB. Shockett thereafter sold the real estate that served as collateral for these loans at a substantial profit, largely for the benefit of Calas and Castilla.

C.    Unrelated Real Estate Ventures

In September 1983, De La Mata approached his friend and RNB client, Jorge Sarria, and identified a vacant lot owned by the EWL Corporation as a potential site for the operation of a gasoline distributorship. Sarria owned and operated gasoline service stations in the Miami-Dade area, and testified that he and De La Mata had a long-standing agreement to invest jointly in a service station when the opportunity arose. The evidence showed that Calas had apparently learned of the opportunity as EWL's account officer at RNB.

De La Mata, Calas and Sarria thereafter entered into an understanding whereby Sarria would receive RNB's financial backing to acquire the lot and construct a retail service station in exchange for De La Mata's and Calas's undisclosed interest therein. Sarria obtained a contract for the purchase of the property in the name of "Sarria and assigns," and assigned the purchase contract to Sarocco, Inc. prior to closing on December 19, 1983. At trial, Sarria testified that

13

Sarocco, Inc. was incorporated on December 9, 1983, and the shares were divided among Sarria (50%), De La Mata (25%) and Calas (25%).

At its December 1983 meeting, the RNB Loan Committee approved a loan to "Sarria and assigns" in the amount of $425,000 for the acquisition and construction of a gas station. De La Mata initiated the motion to approve the loan, and both De La Mata and Calas voted in favor thereof, without disclosing their financial interest in the venture. Several years later, in November 1986, De La Mata and Calas voted to approve the extension of the loan to $550,000, again without making any disclosure of their personal interest.

In December 1986, De La Mata, through his family members, invested in a real estate development venture named "Estate Land Development." Thereafter, De La Mata facilitated a $313,000 loan to that entity, and formally voted to grant the loan at a meeting of the RNB Loan Committee, without disclosing the fact of his family's 25% interest therein.

II.    Procedural History

On April 14, 1992, a federal grand jury sitting in the Southern District of Florida returned an indictment charging De La Mata, Calas, Castilla, Fernandez and corporate co-defendants, Real Estate Partners, Inc. and Hialeah Properties, Inc., on seventy-eight counts arising out of three separate conspiracies, namely the

14

bank branch transactions, the OREO properties, and the corporate loans. Each count incorporated by reference certain "general allegations" set forth at the beginning of the indictment which described the bank insiders' disclosure obligations under federal banking statutes and regulations, internal bank procedures, and the common law.

Appellants filed numerous pretrial motions to dismiss the indictment arguing, inter alia, that the bank fraud and money laundering counts failed to state offenses,[4] that the bank fraud and money laundering charges violated the ex post facto clause, and that the bank fraud counts were multiplicitous and were barred by the applicable statute of limitations. In addition, De La Mata moved to dismiss charges of making false entries, in violation of 18 U.S.C. § 1005, and of conspiring to defraud the United States, in violation of 18 U.S.C. § 371, on the grounds that appellants did not, as a matter of law, have the legal duties alleged by the government. Calas and Castilla moved to strike as surplusage and to exclude from evidence proof of civil and regulatory disclosure requirements on the grounds that it was improper for the government to rely on a civil violation to prove a criminal act.

---

[4] Appellants challenged the acts which the indictment alleged as "executing" the bank frauds, and argued that the indictment failed to charge money laundering offenses separate and distinct from the bank fraud offenses.

The district court, Honorable K. Michael Moore presiding, conducted pretrial hearings regarding the motions on October 13 and 14, 1992. Except for the multiplicity challenge, which the court took under advisement, the district judge denied the defense motions.

Trial commenced on October 15, 1992. The government demonstrated that appellants engaged in a pattern of deception by repeatedly and willfully concealing the bank insiders' personal financial interest in various entities in order to induce RNB to enter into transactions remunerative to the appellants. The government introduced expert and bank witnesses who established the disclosure requirements imposed by federal regulations, as well as RNB's own internal rules prohibiting self-dealing without disclosure and abstention. The government proved appellants' ownership interests in the various entities through uncontroverted documentary evidence, and appellants' intent to deceive the Bank though their own attorneys and "front" men like Blanco.[5]

In defense, appellants sought to prove that they lacked intent to financially harm the bank. The bank insiders contended that they did not know they were required to disclose their involvement and to refrain from voting in the proposed

---

[5] Perez testified that he did not know that the bank insiders were involved in the transaction. Silva testified that his ethical and legal duties as an attorney precluded him from disclosing the identity of his client. Shockett believed that it was the bank insiders' responsibility to disclose their interest.

16

transactions because RNB did not have a written code of conduct until 1988.  In addition, appellants asserted that, because all material financial terms were disclosed, the failure to disclose the bank insiders' interest did not expose the Bank to a risk of loss that it did not knowingly accept.[6]  Arguing that only economic injury was cognizable under the bank fraud statutes, appellants requested an instruction informing the jury that "risk of loss" was an essential element of the crimes of bank fraud and misapplication.

The district court denied the defendants' motions for the aforementioned requested jury instructions.  However, by order dated December 16, 1992, the district court ruled that certain bank fraud counts were multiplicitous and required the government to elect which bank fraud charges it wanted the jury to consider.  As a result of the court striking various counts, the case went to the jury on fifty-nine counts.

The jury returned verdicts adjudging De La Mata and Fernandez guilty as charged.  The jury also found Calas and Castilla guilty on all counts, save the

---

[6] Appellants conceded earning substantial profits on the transactions, but countered that RNB had also benefitted.  Appellants contended that the loans had been repaid with interest, that the OREO transactions allowed RNB to remove defaulted loans from the books, and that the bank branches had operated successfully.

17

substantive offenses arising from the CSEC transaction. The parties entered into stipulations regarding the forfeiture counts.[7]

On April 23, 1993, the district court sentenced the appellants, over objection, under the money laundering guidelines. De La Mata, Calas, Castilla and Fernandez were sentenced to terms of imprisonment of 121, 109, 97 and 97 months, respectively, to be followed in each case by a three year term of supervised release. The district court ordered restitution against De La Mata, Calas and Castilla, jointly and severally in the amount of $1,786,194, and against Fernandez in the amount of $1,424,000. In order to strengthen the possibility of restitution, the district court did not impose fines. The district court granted bond, pending appeal,[8] and appellants timely filed notices of appeal.[9]

III.    Discussion

---

[7] The parties stipulated to the entry of an Order requiring appellants to transfer their two remaining branch leases to the United States, and permitting the government to hold other property as security on the money judgment portion of the forfeiture.

[8] The district court ruled that appellants had raised an issue which presented a substantial question of law within the meaning of 18 U.S.C. § 3143(b)(2): Whether the court erred in denying an instruction that risk of loss constitutes an element of bank fraud and misapplication of bank funds. See Memorandum Order and Opinion dated July 22, 1993.

[9] Appellants initial direct appeal was dismissed in February 1994, when appellants moved for a new trial on the basis that Judge Moore had been under investigation in the Eastern District of New York during appellants' trial. The district court, Hon. William O'Kelley sitting by designation, granted the motion for new trial, however, this Court reinstated the judgment and verdict. See United States v. Cerceda, 172 F.3d 806 (11th Cir. 1999)(en banc).

Appellants contend (1) that application of the newly enacted ten year statute of limitations for financial institution offenses, and their prosecution for the bank frauds charged in counts 2, 3 and 6 violated the ex post facto clause; (2) that the indictment failed to state offenses and was constructively amended at trial; (3) that the jury instructions failed to charge that risk of loss is an essential element of the crimes of bank fraud and misapplication; (4) that Fernandez was incorrectly sentenced under the money laundering guidelines; (5) that the evidence was insufficient to support the convictions of Castilla; and (6) that the district court erred in denying appellants' motion for a new trial based on newly discovered evidence.

A. Ex Post Facto

We review de novo whether appellants' prosecution contravened the ex post facto clause of the U.S. Constitution. United States v. Muench, 153 F.3d 1298, 1300 (11th Cir. 1998).

1. Application of Section 3293

Effective August 9, 1989, Congress extended the statute of limitations for "financial institution offenses" (including 18 U.S.C. §§ 656, 1005, 1014 and 1344) from five to ten years. See 18 U.S.C. § 3293. Moreover, Congress expressly made the prolonged limitations period applicable to all such offenses which had been

19

committed but as to which the former five year limitations period had not yet run. See Pub.L. No. 101-73, § 961(l)(3), 103 Stat. 501 (1989). Thus, offenses committed on or before August 9, 1984, would be barred by the five-year statute of limitations while offenses committed after August 9, 1984, would be governed by the new ten-year limitations period.

Appellants concede that the alleged offenses were subject to prosecution at the time § 3293 was enacted, however they assert that extending the limitations period violated the ex post facto clause because it deprived them of an affirmative defense which they could otherwise have interposed. In other words, appellants maintain that all but three of the substantive financial institution offenses allegedly occurred on or before April 13, 1987, when the five-year limitations period was in effect, and would have been time-barred on the date of indictment, April 14, 1992. This argument misperceives the law.

The ex post facto clause prohibits the enactment of statutes which: (1) punish as a crime an act previously committed which was innocent when done: (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive one charged with a crime of any defense available according to law at the time when the act was committed. Collins v. Youngblood, 497 U.S. 37, 52, 110 S.Ct. 2715, 2724 (1990). Only statutes withdrawing defenses related to the

20

essential elements of a crime, or to matters which a defendant might plead as justification or excuse fall into this latter category.  See id. at 49-50, 110 S.Ct. at 2723.

Moreover, the law is well-settled that extending a limitation period before a given prosecution is barred does not violate the ex post facto clause.  See United States v. Grimes, 142 F.3d 1342, 1345 (11th Cir. 1998) (collecting cases).  The universal vindication of § 3293 against ex post facto challenge is founded on an unbroken line of cases, consistently upholding such extensions, and stretching as far back as Learned Hand's opinion in Falter v. United States, 23 F.2d 420, 426 (2nd Cir.), cert. denied, 277 U.S. 590, 48 S.Ct. 528 (1928) ("... while the chase is on, it does not shock us to have it extended beyond the time first set...").  Thus, we follow our sister circuits in holding that § 3293 did not deprive appellants of a defense within the meaning of the ex post facto clause.  See United v. Brechtel, 997 F.2d 1108, 1113 n.14 (5th Cir. 1993) (collecting cases).[10]

_____

[10]  Appellants would have us find that Grimes was wrongly decided, and that 72 years of uniform jurisprudence has been overruled sub silentio by Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891 (1997) and Carmell v. Texas, 529 U.S. 513, 120 S.Ct. 1620 (2000).  In Lynce, the Supreme Court invalidated a Florida statute which cancelled early release credits awarded to prison inmates, resulting in the reincarceration of many offenders, because the law retroactively increased the severity of punishment.  See Lynce, 519 U.S. at 446-447; 117 S.Ct. at 898.  Moreover, the Court rejected the government's argument, propounded by appellants here, that the early release credits were awarded pursuant to a statute enacted after the date of offense; despite modifications in subsequent years, the basic statute was in effect at the time of petitioner's crime.  See id. 519 U.S. at 447-48; 117 S.Ct. at 899.  In Carmell, the Supreme Court held that a Texas statute permitting conviction in rape cases solely upon the testimony of the

21

2.     Prosecution for Bank Fraud

Appellants contend that counts 2, 3 and 6 infringe the ex post fact clause because they are premised on lease agreements validly executed prior to the enactment of the bank fraud statute, 18 U.S.C. § 1344, on October 12, 1984.  Thus, they argue that any fraud that occurred in connection with the bank branch transactions was completed upon the execution and delivery of the lease agreements on November 3, 1983, August 21, 1984, and August 3, 1984, respectively.  The government responds that bank fraud is a continuing offense such that the schemes charged in counts 2, 3 and 6 merely commenced with the signing of the leases and continued as long as the leases were in effect because they posed a continuing risk of injury to the bank.  Moreover, the government contends that a single bank fraud may be executed numerous times, and that each of the bank frauds charged in counts 2, 3 and 6 was "executed" after the statute was passed.

First, we must determine what constitutes the offense of bank fraud.  Under 18 U.S.C. § 1344, a person is guilty of bank fraud if he " knowingly executes, or attempts to execute, a scheme or artifice ... to defraud a federally chartered or

victim could not be retroactively applied because it reduced the quantum of evidence needed to convict.  See Carmell, 529 U.S. at 552, 120 S.Ct. at 1643.  These cases simply do not call into question the well-established principle that Congress may extend the limitations period before the original limitations period has expired.

22

insured financial institution ....” 18 U.S.C. § 1344 (1985).  The unit of the offense created by § 1344 is each execution or attempted execution of the scheme to defraud, not each act in furtherance thereof.  See United States v. Molinaro, 11 F.3d 853, 856-60 (9th Cir. 1992); accord United States v. Longfellow, 43 F.3d 318, 323 (7th Cir. 1995) (citing cases).  Each component act of a scheme to defraud is not a separate violation because otherwise a single criminal transaction could result in an infinite number of prosecutable offenses having no particular relevance to the purpose of the bank fraud statute.  See Molinaro, 11 F.3d at 860 (finding multiplicitous bank fraud counts charging separately each submission of documents to bank because they were not executions but acts in furtherance of real estate/loan fraud scheme).  Accordingly, a bank fraud offense is complete upon the “execution,” or attempted execution of the scheme.  See United States v. Lemons, 941 F.2d 309, 318 (5th Cir. 1991).[11]

Yet, the government is correct that a single scheme can be executed a number of times, and a defendant may be charged in separate counts for each

---

[11]  Lemons involved a loan fraud scheme in which a bank officer caused his savings and loan institution to fund a large loan in excess of the purchase price and authorized an assignment fee from the loan funds, from which the defendant was to receive a portion for his personal benefit.  See Lemons, 941 F.2d 311-312.  However, the defendant tried to conceal his participation by receiving the money in six separate payments over the course of several months.  See id. at 313.  The Fifth Circuit held that although the payments were in furtherance of the scheme to defraud, as concerned the savings and loan, there was but one execution of that scheme.  See id. at 318.

23

"execution" of the scheme to defraud.  See United States v. Sirang, 70 F.3d 588, 595 (11th Cir. 1995).  In Sirang, the defendant was convicted on six counts of bank fraud for depositing bogus checks, i.e., checks written on accounts which he knew did not have sufficient funds.  See id.  We upheld the convictions against a challenge of multiplicity,[12] reasoning that "'two transactions may have a common purpose but constitute separate executions of a scheme where each involves a new and independent obligation to be truthful.'" Id. at 596 (quoting Molinaro,[13] 11 F.3d at 861 n.16).

The question, then, is what constitutes an "execution" of the scheme.  In Sirang, we distinguished check-kiting cases, in which each check increases the risk faced by the financial institution, from component acts in "a scheme to obtain a certain amount of funds or to obtain financing for a particular transaction[.]" Id. at 596 (quoting United States v. Barnhart, 979 F.2d 647, 650-51 (8th Cir. 1992).  In other words, each part of the scheme that creates a separate financial risk for the financial institution constitutes a separate execution.  See, e.g., Longfellow, 43

---

[12] An indictment is multiplicitous if it charges the same offense in more than one count. See Sirang, 70 F.3d at 595.

[13] In Molinaro, the Ninth Circuit found each transfer of property to be a separate execution in a scheme where straw buyers purchased property to make a savings and loan look profitable and to conceal the real purchaser. See Molinaro, 11 F.3d 853.  The court explained that the transactions were separate executions because they were chronologically and substantively independent, neither depended on the other for its existence, and each had its own functions and purpose. Id. at 860.

F.2d at 324. For example, <u>Longfellow</u> involved a scheme in which the defendant granted a series of loans to members of a credit union to facilitate the sale of his own property, without disclosing his interest in the loans and without transferring title to the credit union as collateral for the loans. <u>See</u> <u>id</u>. at 319. Although the original loans were time-barred, Longfellow refinanced one of the loans within the limitations period. <u>See</u> <u>id</u>. The Seventh Circuit held that the renewal of the loan constituted a separate execution of the scheme because it created a new, independent risk for the credit union. <u>See</u> <u>id</u>. at 324.

Ultimately, the decision of whether a particular transaction is an "execution" of the scheme or merely a component of the scheme will depend on several factors including the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved. <u>Longfellow</u>, 43 F.3d at 323. For example, in <u>United States v. Duncan</u>, 42 F.3d 97 (2nd Cir. 1994), certain directors of a savings and loan association ("the bank") conspired to purchase two properties with the intention of leasing and/or selling them back to the bank while concealing their interest therein from the other directors. <u>See</u> <u>id</u>. Raising an <u>ex</u> <u>post</u> <u>facto</u> challenge on appeal, Duncan asserted that the alleged bank fraud was completed when the bank insiders agreed to usurp the corporate opportunity, i.e., to purchase the properties. <u>See</u> <u>id</u>. at 104. The

25

Second Circuit held that the scheme was not fully executed until the insiders sold the second property to the bank, in April 1985, because the central purpose of the scheme was not merely to seize the properties at a bargain, but also to sell the properties back to the bank at a premium. See id; cf. Lemons, 941 F.2d at 315 (finding sufficient evidence to sustain conviction because loan scheme was not complete, or executed, until defendant received his benefit from the transaction).

Returning to the case at bar, the government contends that bank fraud is a continuing offense. A continuing offense is one which is not complete upon the first act, but instead continues to be perpetrated over time. United States v. Gilbert, 136 F.3d 1451, 1453 (11th Cir. 1998). Because the continuing offense doctrine extends the statute of limitations, we are admonished to construe them narrowly. See Toussie v. United States, 397 U.S. 112, 114-15, 90 S.Ct. 858, 860 (1970). Thus, offenses should not be considered continuing unless "the explicit language of the ... statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing [offense]." Id.

The government asserts that the bank frauds continued until appellants were indicted in 1992 because appellants continued to collect lease payments from RNB and because the purchase options relating to the IPB and Westlands branches

remained pending.  In other words, the fraud continued as long as the leases did, because that was the means by which the appellants were enriched.  Taken to its logical conclusion, the collection of rents on a lease obtained by fraud, for a term of 99 years, would toll the statute of limitations for 99 years.  We think this goes too far.  The law is clear that the bank fraud statute imposes punishment for each "execution" of the scheme to defraud, and not each act in furtherance.  See Longfellow, 43 F.3d at 323 (citing cases); see also United States v. Hare, 618 F.2d 1085 (4th Cir. 1980) (holding that indictment for allegedly receiving something of value pursuant to 18 U.S.C. § 201(g) when defendant accepted a loan was time-barred despite defendant's continued receipt of favorable interest and payment benefits during the term of the loan).

In this regard, the government misplaces reliance on Duncan and Longfellow.  Duncan, as discussed above, involved a scheme strikingly similar to the one at bar, in which bank insiders induced the bank to finance the purchase of certain property which they then leased, and ultimately sold to the bank.  See Duncan, 42 F.3d 97.  We acknowledge that the court characterized *conspiracy and bank fraud* as continuing offenses, however, the court cited exclusively to conspiracy cases as support for that proposition.  See id. at 104 (emphasis added).  Furthermore, because the defendants conceded that bank fraud was a continuing

27

offense, the language is dicta.  See id.  Instead, the court held that "the scheme was

not fully executed" until the defendants sold the second parcel of land to the bank,

after the effective date of the bank fraud statute.  Id.  Thus, the conviction did not

violate the ex post facto clause because the second sale constituted an "execution"

of the scheme.

In Longfellow, the court loosely refers to the scheme as continuing in

rejecting the defendant's argument that the scheme was barred by the statute of

limitations.[14]  See Longfellow, 43 F.3d at 325.  The court goes on to explain that

"[t]he fact that only one or two executions fell within the Statute of Limitations

does not detract from the entire pattern of loans' being a scheme, and renders

Longfellow no less culpable for the entire scheme."  Id.  The court ultimately holds

that the renewal of a loan constituted a separate "execution" of the defendant's

scheme, which brought the entire scheme within the limitations period.  Thus,

Duncan and Longfellow demonstrate not that bank fraud is a continuing offense,

but that a single bank fraud scheme can be executed multiple times.[15]

---

[14]  The court stated that "the scheme continued until the Credit Union was taken out of Longfellow's hands in March 1986."  Longfellow, 43 F.3d at 325.  However, the court opined that the scheme was executed each time Longfellow arranged loans from the Credit Union, received loan proceeds as payment for the property, and failed to transfer title.  See id., 43 F.3d at 324.  The government did not attempt to indict Longfellow for each execution, presumably because the earlier transactions occurred outside the limitations period.  Id. at 325.

[15]  We distinguish United States v. Paradies, 98 F.3d 1266, 1284 (11th Cir.1996) in which this court upheld a conviction for mail fraud pursuant to 18 U.S.C. § 1346 because the defendant

Next, we must consider whether counts 2, 3 and 6 properly charged post-1984 conduct that "executed" the bank fraud schemes.[16]  As to count 2, we find that the sale of the Little Havana groundleases constituted a separate execution of the scheme to defraud RNB.  Even though the purchase option derives from a lease predating the bank fraud statute, appellants had an obligation to disclose their ownership interest in the property at the time RNB exercised the option, in December 1986.  The failure to do so in connection with the sale constituted a separate financial risk to the bank.  See, e.g., Longfellow, 43 F.2d at 324.  Appellants argue that the alleged bank fraud was "executed" when the lease was consummated because that agreement exposed RNB to all, if any risk of loss.  However, the risk inherent in the purchase of the property was separate from the lease and was wholly speculative until RNB actually exercised the option.  In this

continued to use the mail to perpetrate his scheme after the effective date of the statute.  See id. at 1273; cf. United States v. Garfinkle, 29 F.3d 1253, 1259-60 (8th Cir. 1994) (holding that mail fraud scheme continued past the effective date of § 1346, even though mailing occurred on same day § 1346 was signed into law).

[16]  The indictment charged the following acts and dates of execution:

| count 2 | 12-24-86 | Sale of the Little Havana groundleases to RNB through Fernandez Land Trust for $1 million |
| count 3 | 10-19-90 | Disbursement of accumulated rental payments received by Hialeah Properties from RNB under Westlands lease to De La Mata, Calas and Castilla |
| count 6 | 6-11-87 | Receipt of $1 million loan from Ocean Bank collateralized by IPB property and conditional assignment of lease payments due Real Estate Partners from RNB |
| count 17 | 7-30-86 | Sale of Orange Bowl to RNB, and contract to construct bank branch building. |

way, the lease and subsequent exercise of the purchase option are similar to the separate extensions of a loan agreement found to be separate executions of a scheme to defraud. See United States v. Harris, 805 F.Supp. 166, 174-175 (S.D.N.Y. 1992) (reasoning that defendants were faced with a new obligation to be truthful each time they sought a loan extension).

We do not believe that counts 3 and 6 charged executions of the appellants' scheme to defraud RNB. Although the appellants continued to receive lease payments on the Westlands and IPB branches, the fraud was completed when appellants fraudulently obtained the leases with the intent at that time to collect future rent. See United States v. Gregg, 179 F.3d 1312 (11th Cir. 1999) (holding that bank fraud was a completed crime when the defendant fraudulently obtained the deposit of the proceeds of a check with the intent to withdraw the money at a later time). The essence of bank fraud is the obtaining of money or property through fraud--in this case, the failure to disclose the insiders' involvement. In order to find that the disbursement of rent and of the Ocean Bank loan, collateralized by rent due from RNB, constituted executions separate from the underlying leases we would have to hold that appellants had a continuing duty to disclose, i.e., to tell the bank that they owned the property each time they accepted

30

a rent check on the leases. As we discussed above, we do not think the bank fraud statute dictates this result.[17]

Our conclusion is further reinforced by the fact that two of the money laundering counts (counts 5 and 10) charge those transactions that allegedly executed the bank frauds set forth in counts 3 and 6, as transactions involving proceeds of "specified unlawful activity." For example, count 5 charged that appellants knowingly engaged in a transaction involving the proceeds of unlawful activity, i.e., bank fraud, with the intent to conceal the nature, source and ownership of such proceeds. The transaction involving illicit proceeds was identified as the disbursement of rent made by RNB under the Westlands lease to De La Mata, Calas and Castilla on October 19, 1990. The same disbursement of rent could not complete the offense of bank fraud and constitute the offense of money laundering. See United States v. Christo, III, 129 F.3d 578, 579 (11th Cir. 1997). Accordingly, appellants' convictions on counts 3 and 6 violated the ex post facto clause.

---

[17] At oral argument, counsel for the government offered the following hypothetical: Suppose an individual submits a false loan application to induce a bank to extend credit, but the individual has not received the funds yet. Government counsel posited that the fraud was executed upon the making of false statements. This supports our conclusion that the bank branch schemes were executed upon the signing of the lease and loan agreements which materially misrepresented the bank insiders' financial interest.

31

Appellants maintain, without further explanation, that we must reverse their convictions for money laundering because those charges were "predicated upon the time-barred bank fraud[.]" First, we need only address counts 4 and 5 because they are the only money laundering charges predicated solely upon the bank fraud alleged in count 3, which we have reversed.[18]  Second, we clarify our holding that 18 U.S.C. § 1344 could not be retroactively applied to prosecute appellants' scheme to defraud RNB in connection with the Westlands and IPB branches without infringing the ex post facto clause.  This is because appellants did not have fair notice that they could be prosecuted for bank fraud when those leases were executed.  See Weaver v. Graham, 450 U.S. at 28-30, 101 S.Ct. at 964-65 (stating that ex post facto prohibition protects against arbitrary changes in the law and assures that legislative Acts give fair warning of their effect).  However, we are unaware of any legal bar to their prosecution for laundering the proceeds of what was clearly "specified unlawful activity" under 18 U.S.C. § 1956  of the Money Laundering Control Act of 1986.[19]

---

[18]  Counts 10-16 alleged transactions involving proceeds derived from the misapplication of bank funds, charged in counts 7-9, in addition to the bank fraud charged in count 6.

[19]  The two provisions of 18 U.S.C. § 1956 under which appellants were charged provide:
    (a)(1) Whoever, knowing that the property involved in a financial
    transaction represents the proceeds of some form of illegal activity,
    conducts or attempts to conduct such a financial transaction which
    in fact involves the proceeds of specified unlawful activity–
    (A)(i) with the intent to promote the carrying on of specified

That statute makes it illegal to knowingly enter into a financial transaction involving the proceeds of a "specified unlawful activity" with the intent to conceal or disguise the nature, location, source, ownership, or control of those proceeds. United States v. Miller, 22 F.3d 1075, 1079 (11th Cir. 1994). "Specified unlawful activity" includes, inter alia, any racketeering offense listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1956(c)(7)(A). In turn, bank fraud is one of the offenses listed in § 1961(1). A conviction for money laundering does not require proof that the defendant committed the specific predicate offense. See United States v. Smith, 46 F.3d 1223, 1234 (1st Cir. 1995). It merely requires proof that the monetary transaction involved the proceeds of the predicate offense identified in the indictment. See Miller, 22 F.3d at 1079; see also United States v. Mankarious, 151 F.3d 694, 703 (7th Cir. 1998). In this way, the First, Fifth, Seventh and Tenth Circuits have upheld money laundering convictions even though the defendant was not convicted of the underlying offense by which he obtained the money. See United States v. Richard, 234 F.3d 763, 770 (1st Cir. 2000); Mankarious, 151 F.3d

---

unlawful activity; or
***
(B) knowing that the transaction is designed in whole or in part–
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;....

18 U.S.C. § 1956.

694, 703 (dismissing mail fraud counts); <u>United States v. Tencer</u>, 107 F.3d 1120, 1130 (5th Cir. 1997) (reversing convictions for mail fraud); <u>United States v. Kennedy</u>, 64 F.3d 1465, 1480 (10th Cir. 1995) (affirming acquittal on mail fraud counts).

Similarly, although appellants could not be prosecuted for bank fraud <u>ex post facto</u>, it does not necessarily follow that they cannot be convicted for the laundering of proceeds obtained after the enactment of the bank fraud statute.  We hold that these proceeds derived from "specified unlawful activity" i.e., bank fraud, because the Bank occupied the leased premises during a period after federal law prohibited schemes, like the one at bar, aimed at defrauding financial institutions.  Appellants' prosecution for this conduct does not implicate the due process or <u>ex post facto</u> clauses because appellants were on clear notice that federal law prohibited their scheme yet they failed to take any remedial action.  It is well settled that Congress may pass new laws which require us to alter our conduct or risk prosecution.  <u>See</u> <u>Samuels v. McCurdy</u>, 267 U.S. 188, 45 S.Ct. 264 (1925) (holding that Georgia prohibition statutes could be applied to a defendant who had lawfully acquired the liquor before the effective date of the statute, but continued the possession for several years after the change in the law); <u>Chicago & Alton R.R. Co. v. Tranbarger</u>, 238 U.S. 67, 35 S.Ct. 678 (1915) (affirming penalty against

railroad for maintaining embankment in a manner prohibited by new law).

Counts 4 and 5 charged that appellants obtained rent proceeds from Hialeah

Properties' account in 1990, after enactment of the bank fraud statute and after

Congress had declared bank fraud a "specified unlawful activity" under the money

laundering statutes. Moreover, the jury found that appellants engaged in this

transaction in order to conceal the source, nature or identity of these funds, and to

further promote their scheme. Thus, appellants had a choice; they could have

altered their conduct and renegotiated the leases with the Bank after giving full

disclosure of their interests, or they could continue conduct that was now clearly

illegal. Appellants chose to continue collecting and laundering the rent proceeds,

and thus, we uphold appellants' convictions on counts 4 and 5.

Finally, appellants contend that the use of bank fraud as RICO predicates

violated the ex post facto clause because bank fraud was not a predicate act until

August 1989. See Pub. L. No. 101-73, § 968. Assuming, without deciding, that

the predicate acts of bank fraud were based on pre-1989 conduct, the jury found,

by special verdict, that appellants' committed over 30 acts of racketeering. Only 6

of these were based on bank fraud. Thus, we sustain appellants' convictions on

counts 58 and 59 for racketeering and racketeering conspiracy.

    B.    The Sufficiency of the Indictment and Proof at Trial

Appellants contend that the indictment should have been dismissed,[20] because every count therein (the bank fraud, misapplication, false statements, and hence, the RICO and money laundering counts) was based upon non-existent or mis-stated disclosure duties, and thus, the indictment failed to state offenses as a matter of law. We find it noteworthy that appellants moved pretrial to strike from the indictment and to exclude from evidence, as superfluous and prejudicial, any reference to civil banking laws and regulations requiring disclosure of insider transactions.[21] Now appellants assert that their convictions can only be sustained if they had the disclosure duties attributed to them by the federal banking statutes and regulations described in the indictment.

Appellants provide no support for the proposition that a scheme to defraud a financial institution must be predicated upon an affirmative duty to disclose. See, e.g., United States v. Colton, 231 F.3d 890 (4th Cir. 2000) (finding that active concealment with intent to deceive constitutes actionable fraud under 18 U.S.C. § 1344). Assuming, arguendo, that an affirmative duty to disclose material

---

[20] In the district court, appellants moved to dismiss the charges of making false entries for failure to state offenses. Appellants invite us to find that the district court erred in ruling that the accuracy of the alleged duties constituted a factual question. However, our review of the record reveals that the district court found that the challenged counts properly stated offenses. We agree.

[21] The district court denied the motion to strike and/or exclude evidence that civil regulations required disclosure of insider transactions on the grounds that such evidence was probative of the appellants' knowledge and intent.

information is essential to state a cause of action under the bank fraud statutes, we find such a duty based upon appellants' fiduciary relationship with RNB, the bank's own internal policies, and federal banking laws and regulations.

### 1. Fiduciary Duties

First, appellants were not customers dealing at arm's length with RNB, nor were they mere salaried employees of the bank. De La Mata, Calas and Castilla were director and senior officers of RNB, and as such, owed a fiduciary duty to the bank and its depositors. See F.D.I.C. v. Gonzalez-Gorrondona, 833 F.Supp. 1545, 1549 (S.D.Fla. 1993). The fiduciary duty, or duty of loyalty, obligates officers and directors to avoid fraud, bad faith, usurpation of corporate opportunities,[22] and self-dealing. Id.

Appellants assail the indictment's allegations of a duty to guide the bank to decisions "most favorable" to it, arguing that the banking regulations only require that insider transactions be conducted on the "same terms" as those applicable to others. However, we believe that the common law fiduciary duty is distinct and separate from appellants' duties under the banking regulations, which we take up below. Accordingly, we hold that appellants had a fiduciary duty to inform the

---

[22] A corporate opportunity is a business opportunity in which the corporation has a valid and significant corporate purpose. See Cohen v. Hattaway, 595 So.2d 105 108 (Fla.5th DCA 1992).

37

Board of Directors of their interests in the transactions they conducted with RNB, and to avoid participating in any bank transactions that affected them personally. See United States v. Henderson, 19 F.3d 917, 923 (5th Cir. 1994) (stating that fiduciary duty required disclosure and abstention).

### 2. RNB's Internal Rules and Policies

RNB's own internal rules prohibited self-dealing without disclosure and abstention in order to protect the bank's depositors from financial mismanagement. See United States v. Clark, 765 F.2d 297, 303 (2nd Cir. 1985) (finding that violation of internal bank rule or policy designed to protect bank's pecuniary interests evidenced scheme to defraud). The testimony of the bank's principal owner, its chairman, and every officer and employee who testified at trial established RNB's policy that its officers and directors disclose and abstain from self-interested transactions. The testimony established that self-interested transactions included those involving officers' and directors' immediate family members. In furtherance of the policy of disclosure, each executive officer was required to complete an annual questionnaire disclosing all business interests in which s/he, or an immediate family member, maintained a direct or indirect interest. In fact, appellants' appreciation of these rules was proven at trial through incidents of disclosure and abstention made in their presence by other bank officials and in one

38

instance, by De La Mata himself.  Therefore, we reject the contention that the bank insiders were unacquainted with RNB's policy prohibiting self-dealing.

### 3.  Federal Banking Laws and Regulations

In 1978, Congress amended the Federal Reserve Act in response to an alarming string of bank failures, in part due to insider abuses.  See United States v. McCright, 821 F.2d 226, 231 at n.3 (5th Cir. 1987).  In proposing the revised legislation, the bill's House sponsor articulated the motivation behind increased federal oversight:  "It clearly emphasizes that bankers and savings and loan executives are operating with other people's money and that charters for financial institutions are not franchises to establish playpens for insiders."  Id. (quoting H.R. Rep. No. 1383, 95th Cong., 2d Sess. 200, reprinted in 1978 U.S.C.C.A.N. 9273, 9331).

### a.  Extensions of Credit

Under 12 U.S.C. § 375(a), the Federal Reserve was authorized to prescribe rules concerning extensions of credit to bank insiders.  See 12 U.S.C. § 375(a)(10).  Pursuant to that mandate, 12 C.F.R. § 215.4, or "Regulation O" as it is better known, prohibits the extension of credit to a bank insider, or his related entities, when the total indebtedness of such party exceeds $500,000 unless: (i) the loan is approved in advance by a majority of the entire board of directors; and (ii) the

interested party abstains from participating directly or indirectly in the voting. The very first loan which appellants fraudulently obtained from RNB amounted to $700,000 (to finance the purchase of the Little Havana site), and their outstanding balance with RNB never fell below the threshold amount.

Regulation O set forth additional reporting requirements. Section 215.7 required the bank to maintain records of loans extended to executive officers and their related interests, and for this purpose, required executive officers to annually identify their "related interests." See 12 C.F.R. § 215.7. Section 215.9 required the bank to report all insider loans to federal regulators on an annual basis. See 12 C.F.R. § 215.9. In this way, the bank insiders' deception, particularly De La Mata's failure to disclose his business interests in RNB's annual questionnaire, caused RNB to violate numerous federal reporting regulations.

b. Purchases and sales of property

Under 12 U.S.C. § 375, purchases and sales of property between the bank and its directors are permitted: (1) when such transaction is made in the regular course of business upon terms not less favorable to the bank than those offered to others; or (2) when the transaction is authorized by a majority of the board of directors not interested therein. See 12 U.S.C. § 375. Moreover, the statute provided authority for the reporting of such conflicted transactions to federal

40

banking regulators. See id. The evidence at trial showed that the term "in the regular course of business" is commonly understood to mean through a public market. Appellants do not contend that the purchases of OREO property or the lease/sale of branch sites to RNB were conducted on an open market. Rather, they assert that disclosure was not required because these purchases and sales were conducted on fair and reasonable terms. This argument misses the point.

The appropriateness of these transactions was not for the bank insiders to unilaterally determine. The statute dictates that that determination could only be made by disinterested directors. We also find the duty to disclose plain on the face of the statute, and thus, reject appellants' contention that there was no violation unless and until the FRB promulgated appropriate disclosure forms and regulations. Thus, the indictment correctly alleged that appellants were obligated to gain the approval of a disinterested majority of RNB directors prior to engaging in these transactions.

c. Bank Branch Transactions

In order to open new branches, national banks must obtain the prior approval of the OCC, which is granted plenary power over such requests. See 12 U.S.C. § 36(e). During the time period in issue, the OCC required banks to state whether the new branch property was to be leased or purchased from an officer or

41

director,[23] and reserved the right to deny such applications if the terms of the site were more favorable to the insiders than would be available in a comparable transaction with unrelated parties. See 12 C.F.R. § 5.30 (c)(2)(iii). Once again, appellants do not contest the disclosure requirements, but contend that the commercial reasonableness of the bank branch transactions precluded the OCC from denying them. We reject appellants' argument for the reasons set forth above. Accordingly, we conclude that the indictment sufficiently and accurately alleged appellants' duty to disclose and abstain from self-interested transactions, and thus, stated offenses as a matter of law.

De La Mata makes the related argument that he could not be charged with making false entries in annual OCC disclosure forms, RNB questionnaires, and representation letters to RNB's outside auditors because there was no statutory or

---

[23] If the new branch property was leased or purchased from a bank insider, the OCC required the bank to provide an independent appraisal or survey of comparable purchases/leases in the market area and to attach a resolution of the Board of Directors approving the transaction with the officer or director abstaining from the vote. See Comptroller of the Currency, Comptroller's Manual for Corporate Activities, Vol.2, Jan. 1992, at 47-54.

regulatory duty to disclose the information sought therein.[24]  Appellant, however,

misconstrues the law.

The prohibition of false entries is in broad and comprehensive terms.[25]  Mr.

Justice Cardozo, in describing 12 U.S.C. § 592, a forerunner of the modern bank

fraud statutes, defined false entries to include "any entry on the books of the bank

which is intentionally made to represent what is not true or does not exist, with the

intent to deceive it's officers or to defraud the association."  United States v.

Darby, 289 U.S. 224, 226, 53 S.Ct. 573, 574 (1933) (quotation omitted).  The

purpose of the statute is to help insure that inspection of a bank's books will yield a

true picture of the bank's condition.  See United States v. Manderson, 511 F.2d

---

[24]  Counts 44-47 charged De La Mata with failing to disclose to the OCC (1) every business interest he, his spouse, or child had an interest in during the preceding year; and (2) every reportable transaction he, his spouse, child, or any of their related business interests had with the bank in the preceding year.  Counts 50-53 alleged that De La Mata falsely stated in annual letters to RNB's outside auditors that all "related party transactions" had been disclosed.  Counts 54-57 charged De La Mata with falsely representing, in RNB's annual questionnaire of executive officers and directors, that he did not own, directly or indirectly, more than 25% of any business, and that his loans obtained, directly or indirectly, from RNB did not exceed $100,000.

[25]  At the time of De La Mata's acts, 18 U.S.C. § 1005 read in pertinent part:
> Whoever makes any false entry in any book, report, or statement of such bank...with intent to injure or defraud such bank or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank,.. or the Board of Governors of the Federal Reserve System--
>  Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1005 (1988).

179, 180-81 (5th Cir. 1975).  As such, an omission of material information as well as an actual misstatement qualifies as a false entry under the statute.  See United States v. Jackson, 621 F.2d 216, 219 (5th Cir. 1980).

The forms at issue here are annual disclosure forms to the OCC, annual representation letters to RNB's outside auditors, and RNB's annual questionnaire of executive officers and directors.  Irrespective of whether these specific forms or the information requested therein was authorized or required by law, the reports were made in the regular course of the business of the Bank and pertained to the Bank's financial position.  Accordingly, we conclude that the indictment stated offenses of making false entries.  See e.g., United States v. McCright, 821 F.2d 226 (5th Cir. 1987) (holding that bank officer's failure to disclose information in bank questionnaire constituted false entry in violation of 18 U.S.C. § 1005).

4.  Constructive amendment and the doctrine of corporate opportunity

Appellants make two final arguments related to the indictment.  First, they contend that the government constructively amended[26] the indictment by abandoning the theory presented to the grand jury, i.e., that appellants' crimes were

_____

[26]  Under the law in this circuit, "an amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases of conviction beyond what is contained in the indictment."  United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990).

44

based on violations of federal banking laws and regulations, and proving instead that the fraud was based upon the breach of the common law doctrine of "corporate opportunity." However, we have already established that the indictment asserted three sources of duty, including appellants' fiduciary duties. Since the appropriation of a corporate opportunity constitutes breach of a fiduciary's duties, see Cohen v. Hattaway, 595 So.2d 105, 108-9 (Fla. 5th DCA 1992), we find no merit in this argument.

Finally, appellants assert that the government's amended theory of prosecution was flawed because the Florida Legislature abrogated the common law doctrine of corporate opportunity. We disagree.

It is a cardinal principle that an officer or director of a corporation will not be permitted to make out of his official position an undisclosed profit adverse to the corporation's interests and because of their fiduciary character will not be permitted to acquire for their own advantage interests adverse or antagonistic to the corporation. See Independent Optical Co. v. Elmore, 289 So.2d 24, 25 (Fla. 2nd DCA 1974). Indeed, Florida law continues to recognize official liability for misappropriation of a corporate opportunity. See Florida Discount Properties v. Windermere Condo., Inc., 786 So.2d 1271, 1272 (Fla. 4th DCA 2001); see also

<u>Cohen v. Hattaway</u>, 595 So.2d at 108.  Thus, we read F.S. § 607.0831[27] as codifying the "business judgment rule" in Florida.  <u>Accord</u> <u>In re Toy King Distr. Inc.</u>, 256 B.R. 1, 173 (M.D.Fla. 2000).

The business judgment rule protects disinterested directors.  Disinterested directors neither appear on both sides of a transaction nor expect to derive any personal benefit from it in the sense of self-dealing-- as opposed to a benefit which devolves upon the corporation or all stockholders generally.  <u>Id</u>. (<u>quotation omitted</u>); <u>see</u> <u>also</u> <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984).  In this way, F.S. § 607.0831(3)(c) establishes that it is not inappropriate, per se, for a director to derive personal benefit from a transaction which benefits the corporation generally.  However, § 607.0831 did not abrogate the prohibition against theft of corporate opportunities or any other form of self-dealing.  <u>Cf</u>. <u>Perlow v. Goldberg</u>, 700 So.2d 148, 150 (Fla. 3rd DCA 1997) (stating that F.S. § 607.0831 does not shield officers and directors charged with criminal activity, fraud or self-dealing).  The evidence

---

[27]  That statute, entitled "Liability of directors" reads, in pertinent part:
> (3) A director is deemed not to have derived an improper personal benefit from any transaction if the transaction ... [is] not prohibited by state or federal law or regulation and,
> ...
> (c) The transaction was fair and reasonable to the corporation at the time it was authorized by the board, a committee, or the shareholders, notwithstanding that a director received a personal benefit.

F.S. § 607.0831.

at trial established that in 1983, RNB's Board of Directors, including De La Mata, identified a need to open additional bank branches. Armed with this knowledge, De La Mata, Calas and Castilla acquired properties, with RNB's own financing, and then induced the Bank to lease back these properties at rates well above those available on the open market. Accordingly, we find no error with the introduction of evidence at trial that appellants usurped corporate opportunities in furtherance of their plan to defraud RNB.

C.  Jury Instructions

Appellants next contend that risk of loss is an essential element of bank fraud and misapplication, and the district court's failure to instruct the jury on this alleged element mandates reversal of their convictions for violation of both §§ 1344 and 656. We review the district court's refusal to give appellants' proposed instructions for abuse of discretion. See United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). The district court's refusal to give the requested instruction is reversible error only if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense. See id. at 1200.

1.      Bank fraud

47

Although incapable of precise definition, the term "scheme to defraud" includes "any pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." United States v. Goldblatt, 813 F.2d 619, 624 (3rd Cir. 1987). To prove bank fraud under 18 U.S.C. § 1344, the government must show that the defendant (1) engaged in a scheme or artifice to defraud, or made materially false statements or representations to obtain moneys, funds or credit from; (2) a federally insured financial institution; and (3) that the defendant acted knowingly. United States v. Goldsmith, 109 F.3d 714, 715 (11th Cir. 1997); see also United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994). The question here is whether the government must also prove that appellants exposed the Bank to a risk of loss as part of the scheme to defraud.[28]

This is an issue of first impression in this Circuit. The Ninth Circuit has observed that the "Courts of Appeals that have adopted a 'risk of loss' analysis have not made clear whether its proof is necessary or merely sufficient to show intent." United States v. Wolfswinkel, 44 F.3d 782, 785-786 (9th Cir. 1995). The First Circuit, sitting en banc, has held that "intent to harm" is not an element of

---

[28] On November 18, 1988, Congress enacted 18 U.S.C. § 1346 stating that for purposes of Title 18, "the term 'scheme or artifice to defraud' includes a scheme to deprive another of the intangible right to honest services." 18 U.S.C. § 1346. Section 1346 does not apply here because the alleged bank fraud took place before its effective date.

48

bank fraud. See United States v. Kenrick, 221 F.3d 19, 26-29 (1st Cir. 2000) (en banc) (holding that intent element of bank fraud is an intent to deceive the bank in order to obtain something of value, irrespective of an intent to harm the bank). Our review of the cases reveals that courts apply the risk of loss analysis in determining whether a scheme primarily directed at a non-bank third party can still give rise to bank fraud. See Brandon, 17 F.3d at 426 (citing cases); see also United States v. Jacobs, 117 F.3d 82, 92-92 (2nd Cir. 1997) (upholding bank fraud conviction where defendant marketed fraudulent certified drafts for purchase by debtors because he intended, even instructed, debtors to submit drafts to banks for release of indebtedness). Therefore, we believe that "risk of loss" is merely one way of establishing intent to defraud in bank fraud cases. Accord United States v. Hoglund, 178 F.3d 410, 413 (6th Cir. 1999).

In this case, we need not decide whether exposing RNB to a risk of loss was necessary to show appellant's intent. If it is necessary, the government offered sufficient evidence at trial to prove that the appellants' scheme exposed the Bank to potential and actual harm. First, the evidence at trial established that appellants embezzled millions of dollars from RNB. Second, appellants' scheme exposed RNB to potential governmental sanction for the circumvention of regulatory requirements. Accord United States v. Parekh, 926 F.2d 402, 408 (5th Cir. 1991).

Third, appellants' usurpation of RNB's corporate opportunities caused the Bank economic loss.

Appellants contend that the scheme did not subject RNB to a risk of loss that it did not knowingly assume because all the financial terms were disclosed and approved by the Board. In addition, appellants assert that the loans were made at ordinary rates of interest, that the loans were secured either with a mortgage or with RNB's lease payments, and that RNB knew how much profit was involved in these transactions (because RNB knew the purchase prices). The only fact that RNB did not know was that its own officers shared in the profits. This, however, is a clever way of saying that RNB did not know how good a deal it could have gotten. De La Mata, Calas and Castilla had a clear duty, under the federal banking regulations, to disclose self-interest in transactions vis-a-vis the bank. They also had a fiduciary duty to abstain from profiting out of their official positions and from acquiring for their own advantage interests adverse to the bank. In other words, appellants' scheme deprived RNB of the right to conduct these transactions on the same terms as its own faithless officers. Common sense dictates that RNB suffered a loss, albeit maybe not a bottom line deficit. Accordingly, we hold that

the failure to give a "risk of loss" instruction did not seriously impair appellants' ability to present their defense.[29]

We view appellants' argument concerning risk of loss synonymous with a challenge to the district court's instruction on intent, and thus do not address the intent instruction separately.[30]

### 2.     Misapplication

To establish the offense of misapplication of bank funds pursuant to 18 U.S.C. § 656 the government must prove: (1) that the accused was an officer, director, agent or employee of a bank; (2) that the bank was in some way connected with a national or federally insured bank; (3) that the accused willfully misapplied the monies or funds of the bank; and (4) that the accused acted with intent to injure or defraud the bank.  United States v. Morales, 978 F.2d 650, 652 (11th Cir. 1992).  The "intent to injure or defraud the bank" element is established

---

[29]  Appellants cite United States v. Devegter, 198 F.3d 1324 (11th Cir. 2000) for the proposition that risk of economic loss is an essential element of bank fraud, and thus, the district court committed reversible error in failing to instruct the jury accordingly.  However, Devegter held that the indictment alleged facts sufficient to state an offense pursuant to § 1346.  We have already found that the indictment was sufficient, and now conclude that the jury was correctly charged on the elements of bank fraud, including the intent to wrongfully obtain money or other property from the Bank.

[30]  The district court charged that intent to defraud means "to act knowingly and with specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another, or bringing about some financial gain to one's self."

by proof that the defendant knowingly participated in a deceptive or fraudulent transaction.  United States v. Blanco, 920 F.2d 844, 845 (11th Cir. 1991).

Appellants contend that they could not be convicted of misapplication absent a jury finding that the extensions of credit charged in counts 7-9, 18-20 and 28 exposed RNB to a risk of loss.  See United States v. Clark, 765 F.2d at 302-03. However, the court in Clark explained that conviction for misapplication of bank funds requires that the bank officers' conduct involve more than the violation of a rule or policy not designed to protect the bank against monetary risk.  See id. (distinguishing bank loan limits from rule prohibiting, solely for political reasons, loans to companies doing business with the apartheid government of South Africa). The Second Circuit concluded that the failure to charge on risk of loss was not erroneous because the rule in question was designed to protect the bank against monetary risk, and thus, equated to a finding that the defendant intentionally circumvented risk-related restrictions in order to obtain money for themselves.  See id.

In this case, the record is clear that, in addition to the violation of federal regulations, appellants violated internal bank rules aimed at protecting RNB's assets; they intentionally provided false information to acquire loans.  Moreover, they induced RNB to extend the loans, and thus, took financial advantage of a

52

confidential relationship.  Accord. United States v. Bates, 852 F.2d 212, 215-216 (7th Cir. 1988).  We find no abuse of discretion in the district court's refusal to give the requested instruction.

Finally, Castilla argues that the district court improperly denied his proposed instruction on good faith and advice of counsel, while at the same time giving such an instruction on behalf of Fernandez.  The failure to give a  proposed charge constitutes reversible error only if it has adequate legal and factual underpinnings. United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir. 1982).  After reviewing the record and all relevant testimony, we agree with the district court that the proposed charge lacked evidentiary support.  Castilla's defense at trial was not that he had proceeded on the good faith belief that his conduct was lawful, but rather that he did not intend to harm the bank.  Castilla elected not to testify at trial, and the evidence relied on to exonerate him simply does not support the notion that Castilla acted in good faith.  The evidence also refutes Castilla's asserted reliance on advice of counsel.  Shockett was falsely told that the requisite disclosures had been made, Silva testified that he was cognizant of his need to conceal from RNB the participation of the bank insiders, and Perez was never informed as to the identities of the purchasers.   Finally, we note that defense counsel fully aired Castilla's good faith defense in closing arguments, and the district court reinforced

the theory by informing the jury that Castilla contended that he did not intend to injure the Bank. In view of the underlying evidence and the district court's specific intent instructions, we find no abuse of discretion.[31]

D.    Evidentiary Rulings

Fernandez contends that the district court's rulings sustaining hearsay objections deprived him of the fundamental right to testify in his own defense. Fernandez claims that he attempted to recount conversations he had with various bank officials in order to show that the bank knew about his co-defendants' interest. He maintains that the statements were not offered for their truth, but for the effect on his state of mind and thus were relevant to show that he lacked the requisite criminal intent.

The district court has broad discretion in ascertaining admissibility of hearsay evidence, which we will not disturb absent abuse of discretion. United States v. NationsBank of Fla. N.A., 53 F.3d 1548, 1554 (11th Cir. 1995). Moreover, the harmless error standard applies to erroneous evidentiary rulings. See Aetna Cas. & Surety Co. v. Gosdin, 803 F.2d 1153, 1159 n.12 (11th Cir. 1986).

---

[31] We also find that the appellants' requested jury instruction regarding the statute of limitations applicable to the fraud and misapplication charges (18 U.S.C. §§ 656 and 1344) was correctly rejected by the district court as lacking the necessary evidentiary foundation. Aside from counts 3 and 6, see infra, there was no conflicting evidence presented at trial that the challenged offenses were committed prior to August 9, 1984. We find no merit, and thus, do not address appellants' remaining arguments with respect to the jury instructions.

After reviewing the record, we find that the exclusion of this testimony did not substantially affect Fernandez's ability to present his good faith defense. See Fed.R.Crim.P. 52(a). The defense could have cross-examined or recalled bank officials to testify concerning their dealings with Fernandez, if indeed these statements could have been helpful to Fernandez's defense. Moreover, the evidence overwhelmingly established that Fernandez intentionally concealed the identities of his partners. During the course of the scheme, Fernandez made more than twenty statements, in the form of loan applications or financial statements, to RNB that fraudulently concealed the bank insiders' interest in the proposed transactions. Accordingly, we conclude that the exclusion of this testimony was harmless error, if error at all.

E.    Sufficiency of the evidence

Castilla contends that the evidence does not support any of his 37 counts of conviction. We review the sufficiency of the evidence de novo, viewing the evidence and all reasonable inferences and credibility choices made in the government's favor. See United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997). We will reverse a conviction only if we find that a reasonable fact-finder could not find proof of guilt beyond a reasonable doubt. See United States v. Adkinson, 158 F.3d 1147, 1150 (11th Cir. 1998).

Essentially, Castilla assails the government's proof of his intent to defraud RNB. He asserts that the evidence failed to establish that he knowingly and voluntarily agreed to defraud the Bank, or that he committed any acts designed to facilitate the alleged scheme. The evidence refutes this contention.

First, Castilla held a 25% stake, the equivalent of Calas', in the various front companies appellants formed to conceal the bank insiders' interest. This included Hialeah Properties, the Fernandez Land Trust, Real Estate Partners, Great Group and CSEC. Second, Castilla's interest in these entities was not an act of charity, as he would have us find, but compensation for his active role in promoting the affairs of the enterprise. As a member of RNB's Loan Committee, Castilla voted to extend loans to these entities, while concealing the insiders' conflict of interest, on at least nine occasions. Castilla arranged for CSEC, an entity nominally owned by Castilla's family and Shockett, to receive an unsecured loan for the purchase of OREO property from RNB. Castilla, along with Calas, received a substantial portion of the profit on the resale. Moreover, the jury could have concluded that Castilla recruited Fernandez as the insiders' front man since Fernandez had been Castilla's banking customer and friend for many years. In fact, Castilla provided Fernandez with the initial deposit for the Little Havana site. Castilla also provided part of the down payment on the IPB branch. The evidence showed that Calas and

56

Castilla retained Shockett to represent them in the IPB transaction because Castilla's niece was Shockett's secretary. Castilla falsely told Shockett that he had disclosed his conflict of interest to RNB, further evincing Castilla's criminal intent. Finally, illicit proceeds from the various transactions were continuously deposited into a joint account that Castilla maintained with Calas, yet Castilla never questioned or repudiated his share of the profits. Although Castilla contends that he did not know the source or the fact of such deposits, the evidence showed that an account at a small savings and loan was opened for the sole purpose of concealing his share of the profits.[32] Thus, we find sufficient evidence that Castilla actively participated in virtually every aspect of the scheme with the intent to defraud RNB.

F.      Sentencing

Fernandez asserts that the district court should have computed his offense level under the more lenient fraud guidelines because the money laundering was a minor, incidental part of the appellants' scheme, and thus, outside the "heartland" of the money laundering guideline. We review the district court's application of

_____

[32] The evidence showed that a joint account in the name of Calas and Castilla was opened at Metropolitan Bank on October 10, 1984, with an initial deposit of $55,125. That same day, the proceeds from the sale of the Little Havana parking lot were disbursed from Fernandez' account in the form of two checks drawn in the amount of $55,125 each. The second check was deposited into De La Mata's account at the Metropolitan, an account that was also opened on October 10, 1984, with that initial deposit.

the Sentencing Guidelines under a de novo standard, but review its findings of fact only for clear error. See United States v. Harness, 180 F.3d 1232, 1234 (11th Cir. 1999).

Appellants were convicted of bank fraud, money laundering, false statements, false entries and misapplication of bank funds. The district court assigned all counts of conviction to a single group pursuant to U.S.S.G. § 3D1.2(d) (requiring grouping when the offense level is determined on the basis of the total amount of harm or loss, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior). The grouping is not challenged on appeal. Having grouped the offenses, the district court applied the guideline that produced the highest offense level as instructed by U.S.S.G. § 3D1.3(b). With respect to Fernandez, the bank fraud counts carried an offense level of 24, U.S.S.G. § 2F1.1(a), while the money laundering counts carried a level of 28, U.S.S.G. § 2S1.1(a)(1). Thus, the district judge sentenced Fernandez to 97 months, at the lowest end of the laundering guideline range of 97-121 months.

Fernandez relies on United States v. Smith, 186 F.3d 290 (3rd Cir. 1999), in which the Third Circuit opined that a sentencing court should consider whether the designated guideline applies or whether the conduct is "atypical" in comparison to that usually punished by the statute of conviction, and if so decides which

guideline is more appropriate. Id. at 297; but see U.S.S.G., Supplement to App. C, Am. 591, at 32 (2000) (removing the "atypical" language from the Guideline and explaining that it had been improperly used by courts to decline to use the offense guideline in cases that were allegedly "outside the heartland"). However, we have rejected this approach. In United States v. Adams, 74 F.3d 1093 (11th Cir. 1996), the district court applied the fraud rather than money laundering guidelines reasoning that the gravamen of the defendants' unlawful scheme was fraud and that the subsequent deposit of illicit proceeds was merely incidental. See id. at 1101. This Court reversed and held that the money laundering convictions had to be considered in determining the defendants' base offense levels because, otherwise, the jury's guilty verdict on the money laundering would be nullified. See id.

In any event, we conclude that the money laundering at bar was integral to appellants' scheme. See Smith, 186 F.3d at 298 (quoting Sentencing Commission Report to Congress that the "heartland" of money laundering includes separate monetary transactions designed to conceal past criminal conduct or to promote further criminal conduct). Pursuant to a special verdict, the jury specifically found that appellants engaged in money laundering in order to conceal the origins of the illicit proceeds and to continue the bank fraud scheme. Thus, we find no error in sentencing Fernandez under the money laundering guideline for this conduct.

59

Fernandez also claims that the district court erred in denying his request for a downward departure because this was an extraordinary case involving deals favorable to the bank and approved by bank officials.  We review the district court's discretionary refusal to depart downward only if the district court erroneously believed it did not have the statutory authority to do so.  See United States v. Sanchez-Valencia, 148 F.3d 1273, 1274 (11th Cir. 1998).  Fernandez contends that the district court wholly failed to address the grounds for his request, and thus, was ambiguous as to whether the court had authority to depart from the guideline.  However, our review of the record reveals that Fernandez requested a downward departure on the basis that he was not a bank officer, and thus, was less culpable than his co-defendants.  Accordingly, the district court rejected the request stating that the money laundering guidelines did not overstate Fernandez's role in the scheme, which required the concerted effort of each of the appellants. We will not disturb the district court's discretionary refusal to depart downward.

Finally, Fernandez contends that the district court erred in enhancing his sentence for obstruction of justice, and in denying him the opportunity to be heard prior to its ruling.  Fernandez concedes that the government's response to Fernandez's Pre-Sentence Report put him on notice that the government was seeking application of the obstruction enhancement over five weeks before the

sentencing hearing commenced.  However, he argues that he was not given an adequate opportunity to respond because the government did not identify specific instances of perjured testimony.

After reviewing the record and sentencing hearing transcripts, we find no merit in this position.  First, Fernandez failed to file any response or objection to the government's initial request for enhancement.  At the sentencing hearing, on April 21, 1993, the government supplemented its earlier written submission by enumerating specific examples of Fernandez's perjury.  The following day, the government filed with the court, and served on defense counsel, an additional written memorandum further refining the government's position.  Defense counsel again elected not to file any response.

When the sentencing hearing was renewed on April 23, 1993, the court concluded that Fernandez had perjured himself on at least four occasions when he testified that bank officials approached him and persuaded him to use the various properties as branch sites instead of developing shopping centers as he had planned.  The district court found that this testimony was not credible and moreover, was specifically contradicted by the testimony of Dr. Botifoll and Mr. Isaias, who both stated that Fernadez solicited them.  We give due deference to the district court's opportunity to determine credibility, see 18 U.S.C. § 3742(e), and

thus, cannot conclude that the enhancement for obstruction of justice was clearly erroneous.  See United States v. Simmons, 924 F.2d 187, 191 (11th Cir. 1991).

G.    Motion for New Trial

Alas, appellants' attack with respect to every aspect of their prosecution would not be complete without an argument that newly discovered evidence mandates a new trial.  They contend that the district court erred in summarily denying their motion for new trial and/or vacatur of the restitution order[33] in light of the terms of the "Settlement Agreement" entered into between the government and RNB in January, 1994.  That understanding, among other things, resolved RNB's corporate liability in connection with a pending investigation of narcotics money laundering activities that occurred at the Bank during the insiders' tenure.  The Settlement Agreement also provided that RNB would purchase the IPB and Westlands sites at the conclusion of the respective leases, at a price to be determined by an independent appraiser, subject to a credit for excessive rents, which rent the government would continue to collect, per the forfeiture order.  The IPB lease expired, and appellants allege that the government's resulting failure to

---

[33]  On April 23, 1993, the district court entered an Order of Restitution, pursuant to 18 U.S.C. § 3663, in favor of RNB against appellants in the amount of $1,786,194.  That sum represented illicit profits earned on the OREO purchases and on the sale of the Little Havana and Orange Bowl branches, and rent paid in excess of the fair market rental value on the Westlands and IPB leases as of October 1992.

62

remit the excessive rents, in addition to the sale of the property to a third party for $1.4 million, far greater than that established at trial, constitute new evidence that the bank branch leases were fair. Moreover, appellants' assert that the post-trial execution of the Settlement Agreement reveals RNB's previously undisclosed motive to curry favor with the government, by suppressing the true value of the bank branch sites.

After reviewing the parties' briefs, the Settlement Agreement, and all other relevant parts of the record, we find no abuse of discretion. First, the IPB transaction constituted one part of the appellants' intricate fraud, and only one of several components of the district court's restitution calculation. Second, the rental overcharges incorporated into the restitution order and those dealt with in the Settlement Agreement are separate and distinct. The restitution order required appellants to restore to RNB only the excessive rent payments which the Bank actually made during the 1984-1992 period. The Settlement Agreement, on the other hand, deals with the rent paid after January 1, 1994. Thus, the Settlement Agreement did not affect the amount of restitution.

Moreover, assuming that risk of economic loss is an element of bank fraud, the increased value of the IPB site does not constitute new evidence entitling appellants to a new trial on all charges, or even the invalidation of the restitution

order.  The only valuation which was relevant at trial was the property's objective fair market value in 1984.  This figure is based on publicly reported sales of comparable property at the same time, and is not discredited by a price commanded in 2000.  Moreover, even if we were to find, which we do not, that an increase in market value would constitute evidence that the rents were not excessive, the appreciation would also increase the value of the opportunity usurped by the bank insiders.  In other words, although the rental payments might be viewed as less exorbitant, the illicit profit anticipated by appellants on the resale would be substantially increased.  Accordingly, we find no abuse of discretion in the district court's judgment that this evidence did not entitle appellants' to a new trial and/or vacatur of the restitution order.

IV.    Conclusion

For the reasons set forth above, we reverse appellants' convictions on counts 3 and 6, and sustain their convictions on all other counts.  Because of the grouping prescribed by the sentencing guidelines, we find that the reversal of counts 3 and 6 does not alter in any way the sentences imposed.

AFFIRMED in part and REVERSED in part.