[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15259
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cr-20144-RNS-7

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEJANDRO JESUS CURA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 18, 2016)

Before HULL, WILLIAM PRYOR and FAY, Circuit Judges.

PER CURIAM:

After pleading guilty, Alejandro Cura appeals his 51-month sentence for conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349. On appeal, Cura raises only one issue.  Cura argues that the district court erred in holding him accountable for the "intended loss" amount of $31 million and increasing his base offense level by 22 levels under U.S.S.G. § 2B1.1(b)(1)(L). After review, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Indictment

Cura, along with 15 codefendants, was indicted for conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. §§ 1347, 1343, and 1349 (Count 1), and for 11 counts of healthcare fraud, in violation of 18 U.S.C. § 1347 (Counts 2-11).

Count 1 alleged that Cura and his co-conspirators "knowingly and willfully, . . . with the intent to further the objects of the conspiracy," agreed to: (1) "knowingly and willfully execute a scheme and artifice to defraud" several healthcare benefit programs, including insurance plans managed by United Healthcare (UHC), BlueCross Blue Shield (BCBS), and Cigna; and (2) "knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property" by knowingly making materially

2

false and fraudulent representations using wire communications in interstate commerce.

The purpose of the conspiracy was for Cura and his co-conspirators to "unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to a health care benefit program; (b) concealing the submission of false and fraudulent claims to a health care benefit program; (c) concealing the receipt of the fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, and the use and benefit of others, and to further the fraud."

As to the manner and means of the conspiracy, the indictment charged that Cura and others "agreed, in exchange for a fee, to have companies placed in their names, to open bank accounts and check cashing accounts in the names of the companies, and to cash and deposit checks received from Cigna, BCBS, and UHC." These 31 companies were actually owned and controlled by some of Cura's co-defendants. The conspirators then submitted false claims to the private insurance plans on behalf of these 31 companies, seeking in total over $125 million as reimbursement for medical treatments, items, and services that were not ordered by a physician or provided to the beneficiary as claimed.

**B.    Plea Agreement and Stipulations**

3

Pursuant to a written plea agreement, Cura pled guilty to Count 1, and the government agreed to dismiss the remaining counts. Cura and the government agreed to recommend jointly to the sentencing court these factual findings and conclusions: (1) under U.S.S.G. § 2B1.1(a)(1), the base offense level was 7; (2) under U.S.S.G. § 2B1.1(b)(1)(L), the actual or intended loss resulting from Cura's conduct in the indictment was between $20,000,000 and $50,000,000; (3) Cura was a minor participant in the offense; (4) Cura's offense did not involve the use of sophisticated means; and (5) Cura should receive a 3-level reduction in his offense level for acceptance of responsibility. Cura also agreed to, among other things, a judgment of forfeiture and restitution in the amount of $13,853,392.

## C.     Guilty Plea and Colloquy

In August 2015, Cura pled guilty to Count 1. During the plea colloquy, Cura stated that his attorney had translated the plea agreement into Spanish, he and his attorney had reviewed the plea agreement, and Cura understood and agreed to its terms. Cura admitted, inter alia, that he had conspired with others "to engage in a scheme to fraudulently bill insurance companies," and that he was "a registered agent for several companies, including Doral Recovery, JRG, Lauralex, Premier and Universal," and that he "use[d] [his] companies to assist the scheme in fraudulently billing several different insurance companies[.]"

## D.     Presentence Investigation Report

4

The revised Presentence Investigation Report ("PSI") recounted these undisputed facts.  The health care fraud scheme Cura participated in was centered on inducing licensed massage therapists to open health care clinics, which enabled the conspirators to bill insurance carriers through the clinics without having to undergo a lengthy application process.  After the clinics were opened, the conspirators fraudulently billed insurance carriers for medical services that were never provided.  The conspirators would often change the clinics' ownership by finding new nominee owners, and the nominee owners were paid approximately $2,000 to $10,000 per month, per clinic, for their roles in the scheme.  The conspiracy was led by Reynaldo Castillo and several members of his family, who were the true owners of the fraudulent clinics.

From October 2012 to February 2015, Cura served as the nominee owner for five of the fraudulent clinics: (1) Doral Recovery Center, Inc. ("Doral"); (2) JRG Rehabilitation Center, Inc. ("JRG"); (3) Lauralex Medical Services, Inc. ("Lauralex"); (4) Premier Health Services, Inc. ("Premier"); and (5) Universal Recovery Center, Corp. ("Universal").  Cura agreed to have these companies placed in his name, to open bank accounts and check cashing accounts for these companies, and to cash and deposit checks received from the insurance providers. During the conspiracy, Cura's five clinics submitted claims totaling $31,662,510, and were paid $5,082,570 by insurance companies.  Cura became the owner of

5

these clinics from the time they were created, and corporate records confirmed his involvement with the clinics.

The PSI also noted that Cura was responsible for a total loss of $31,662,509.67, which was the amount of the fraudulent claims submitted by the five clinics.   The PSI recommended a minor role adjustment because Cura lacked knowledge of the entire scope of the conspiracy and had profited much less than his co-conspirators.

The PSI calculated a base offense level of 7, pursuant to U.S.S.G. §§ 2B1.1(a)(2) and 2X1.1(a)(1), and included a 22-level increase, pursuant to § 2B1.1(b)(1)(L), because the intended loss amount of $31,662,509.67 was more than $25,000,000 but less than $65,000,000.  The PSI included: (1) a 2-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because Cura committed the offense using sophisticated means; (2) a 3-level reduction based on Cura's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a)-(b); and (3) an additional 2-level reduction, pursuant to U.S.S.G. § 3B1.2(b), based on Cura's minor role in the conspiracy, yielding a total offense level of 26.

With a criminal history category of I and a total offense level of 26, Cura's advisory guidelines range was 63 to 78 months' imprisonment, and the maximum statutory penalty was 20 years' imprisonment.

6

In his October 2015 written objections, Cura did not dispute the total amount of $31,662,509.67 that his five clinics billed the insurance companies. Cura did object to the PSI's 22-level increase under § 2B1.1(b)(1)(L). Cura argued that he should receive only an 18-level increase because of a proposed amendment to the definition of "intended loss" in the commentary to § 2B1.1, which would be effective November 1, 2015. Cura also objected to the 2-level increase for sophisticated means.

### E.    Sentencing Hearing

At his November 12, 2015 sentencing hearing, Cura argued that, as the nominee owner of the five clinics, he was unaware of the many millions of dollars in fraudulent claims his co-conspirators submitted to the insurance companies, and therefore he did not have the subjective intent to inflict the total pecuniary harm of $31,662,509.67. Cura maintained that instead he should be held accountable for only the actual loss—the $5,082,570 the insurance companies paid to the five clinics—which would result in an 18-level increase.

The district court stated that the government had proved that the intended loss amount of $31 million was reasonably foreseeable to anyone participating in the conspiracy, including Cura, given the number of clinics Cura nominally owned and the fact that he admitted signing blank checks. The district court also noted

7

that the parties had "agreed to a certain number of facts" that indicated it was reasonably foreseeable to Cura that there would be "a significant amount of fraud."

The government emphasized that Cura, in his plea agreement, had already agreed to a loss amount between $20,000,000 and $50,000,000. When Cura indicated he wished to testify, the district court stated that it would consider Cura's testimony as to what he believed.

Cura testified that he originally worked as a massage therapist at World of Rehab, a clinic that treated accident victims. Cura was hired by a man named Danny Jacomino, whom Cura believed owned World. After Cura left World, he learned that Reynaldo Castillo was the true owner of World and that the clinic was involved in staging accidents.

Three or four months later, Castillo approached Cura, and Cura agreed to lend Castillo his name to a new clinic, Lauralex, but that Castillo would be the true owner. Cura also worked at the clinic as a massage therapist. Although Cura admitted that he knew Castillo had already been involved in operating a fraudulent clinic, Cura claimed he did not know that Castillo planned to engage in fraudulent billing at Lauralex. Cura began to grow suspicious when he "was writing quite a lot of checks and the figures were quite high," and "saw that the incoming amount of money had no relationship to the flow of staff." Cura said he was not involved with patient billing or depositing incoming checks from insurance companies.

8

However, Cura admitted he took out large sums of money and signed checks whenever Castillo directed. Cura maintained that many of the checks he signed at Castillo's direction were blank, but that the checks with a stated amount were for $6,000 or $7,000, at most. Cura also admitted that he deposited checks from Lauralex into his own personal account and then at Castillo's direction withdrew amounts of $4,000 or $5,000 at a time and gave it to Castillo.

Cura knew illegal activity was taking place after he fielded a call from a doctor who complained that he had received a bill for services he had not provided. Cura complained to Castillo and demanded that his name be taken off Lauralex's corporate documents. Nonetheless, Cura admitted that he agreed to open more clinics with the Castillos and that he knew the Castillos were going to use those clinics to bill private insurance companies. Cura claimed that the Castillos assured him that the clinic would be a legitimate business, but Cura admitted he did not ask to see billing or bank statements and "simply worked there as a therapist."

After Cura testified, Cura's attorney argued that although Cura knew about the money he handled, "at no point would he have become aware or could have become aware there was $31 million." The district court responded by finding Cura's testimony lacked credibility. Even if Cura's testimony were credible, the district court found Cura's testimony established willful blindness, as follows:

> Wait. You say at no point did he or could he. He could have. He just said the third time around he didn't ask, even though he

9

supposedly quit two other times when he found out something illegal was going on, which, I mean, based upon all of his testimony, he's not really entitled to much credibility.

But let's assume I credit him and believe him. So he's back in the third time with the same people committing fraud and he says nothing changed, okay? He didn't ask to see the bank statements, didn't ask to see the billing, didn't do anything at all. Isn't this exactly what willful blindness is all about? Don't tell me anything so that way I can't be responsible.

After listening to the parties' arguments, the district court explained that Cura had not testified credibly about his subjective belief as to the loss amount.

The district court overruled Cura's objection to the 22-level increase, finding that the government had proved that the participants in the conspiracy intended a loss of $31 million and that Cura had not testified credibly that he was unaware of that intended loss amount, as follows:

Let me just say again, I think the government has proven that the intended loss of the people who participated in this crime is $31 million. The new guidelines allow a particular defendant to say, wait a minute, I did not understand that and here is why I didn't understand it was that much, okay? And your client failed to do that.

The district court sustained Cura's objection to the sophisticated means enhancement and calculated a total offense level of 24, which yielded an advisory guidelines range of 51 to 63 months.

The district court sentenced Cura to a 51-month prison term.

## II. DISCUSSION

10

The district court did not clearly err in finding Cura responsible for the full intended loss from the five clinics that Cura nominally owned for the health insurance fraud conspiracy.  See United States v. Moran, 778 F.3d 942, 974 (11th Cir.), cert denied sub nom. Huarte v. United States, 136 S. Ct. 268 (2015); U.S.S.G. §§ 1B1.3(a)(1)(B), 2B1.1 cmt. n.3(A)(ii).[1]  The record contains Cura's guilty plea, the factual stipulations in Cura's plea agreement, and the undisputed facts in the PSI.  Taken together, they support the district court's attribution of loss. See United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002).

Count 1 charged that Cura committed the fraud conspiracy "knowingly and willfully, with the intent to further the objects of the conspiracy."  The specific objects of the conspiracy in Count 1 were for the conspirators to enrich themselves by, among other things, submitting fraudulent claims to health insurance companies and concealing the fraud and its proceeds.  Count 1 charged that Cura's particular role in the conspiracy was to act as a nominal owner of the companies used to perpetrate the fraudulent billing and to open accounts used to receive and distribute the fraud proceeds.  Cura pled guilty to Count 1 as charged.

---

[1]We review the district court's factual findings under the Sentencing Guidelines for clear error and its legal interpretation of the Guidelines de novo.  United States v. Williams, 340 F.3d 1231, 1238-39 (11th Cir. 2003).  The district court's determination as to the loss amount is a factual finding reviewed for clear error.  See United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011).

Furthermore, during his plea colloquy, Cura admitted that he had agreed with his co-conspirators to engage in the scheme to fraudulently bill the insurance companies, that he was the registered agent for five of the companies used to conduct the fraudulent billing, and that he "use[d] [his] companies to assist the scheme in fraudulently billing several different insurance companies[.]" At sentencing, Cura admitted he signed company checks, most of which were blank, whenever directed to do so by the conspiracy's leader, Reynaldo Castillo, and also deposited fraud proceeds received by his companies into his own personal account and then withdrew those proceeds in cash amounts and gave them to Castillo as directed.

Most importantly though, in his plea agreement, Cura stipulated that the loss, whether actual or intended, resulting from his conduct in the charged conspiracy was between $20 million and $50 million. Indeed, at sentencing, Cura did not dispute that his co-conspirators used his five companies to submit over $31 million in fraudulent claims to health insurance companies.

To the extent Cura did not personally submit the fraudulent claims or deposit the fraud proceeds, the district court properly included the amount of the claims filed by his co-conspirators at the five clinics as relevant conduct because those claims were reasonably foreseeable to Cura. See U.S.S.G. § 1B1.3(a)(1)(B); United States v. Mateos, 623 F.3d 1350, 1370 (11th Cir. 2010).

Further, given the specific objectives of the fraud conspiracy Cura joined and Cura's admission that he used the five clinics to facilitate those objectives, the district court did not clearly err in finding that Cura shared his co-conspirators' intent to cause $31 million in fraudulent insurance claims. That is, the record supports the district court's finding that Cura, along with his co-conspirators, sought to inflict the pecuniary harm reflected in the $31 million in fraudulent claims submitted through Cura's five clinics. See U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). While Cura testified that he was unaware of the full extent to which his co-conspirators were fraudulently billing, the district court found Cura's testimony not credible.

For these reasons, the district court did not clearly err in holding Cura accountable for the full amount of the intended loss from the five clinics Cura owned for the conspiracy's purposes and imposing a 22-level increase in Cura's offense level under U.S.S.G. § 2B1.1(b)(1)(L).

**AFFIRMED.**